**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **Columbia Gas of Ohio, Inc.,** : | |
| **200 Civic Center Drive** : | |
| **Columbus, Ohio 43215,** : | |
| : | **Case No. 2:09-cv-299** |
| **Plaintiff,** : | |
| : | |
| : | |
| v. : | Judge |
| : | |
| **City of Columbus** : | |
| **50 West Gay Street** : | Magistrate Judge |
| **Columbus, Ohio 43215-9040** : | |
| : | |
| **and** : | |
| : | |
| **Boyce Safford III** : | |
| **Director, Department of Development** : | |
| **City of Columbus** : | |
| **50 West Gay Street** : | |
| **Columbus, Ohio 43215-9040,** : | |
| : | |
| **Defendants.** : | |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff Columbia Gas of Ohio, Inc. ("Columbia") for its claim against the City of Columbus, and its Director of Development, Boyce Safford III, in his official capacity, alleges as follows.

**Nature of the Action**

1. Columbia brings this action to protect and enforce its rights under the Natural Gas Pipeline Safety Act ("NGPSA"), 49 U.S.C. § 60101 *et seq.*, and the Supremacy Clause of the United States Constitution, U.S. Const. Art. 6, § 2.

2. Columbia, Ohio's largest natural gas distribution utility, is in the process of undertaking a major Infrastructure Replacement Program ("IRP") to modernize and improve the safety and reliability of its distribution system in Ohio.  One aspect of this program, the Accelerated Mains Replacement Program ("AMRP") involves replacing the main gas pipeline that runs underneath the street, replacing the service line that connects the main pipeline to a home or business, and relocating the gas meter to the outside of the customer's premises if it is currently inside the premises.  The IRP and the AMRP have been approved by the Public Utilities Commission of Ohio, which has the exclusive jurisdiction under Ohio law to regulate the affairs of natural gas distribution utilities in Ohio, and the terms and conditions for natural gas distribution service.

3. The City of Columbus and Defendant Safford are wrongfully interfering with Columbia's implementation of the AMRP by demanding that Columbia obtain a permit from the City prior to relocating any gas meters to the outside of the customer's premise and demanding that Columbia allow the City to inspect this work upon completion.  The City contends it has the authority to require such permits and inspections pursuant to its authority to enforce state and local building code regulations.

4. Columbia seeks a declaration that the City is preempted by federal law from applying its permitting and inspection regulations to Columbia's pipeline repair and replacement activities, including the relocation of gas meters. Columbia also seeks a preliminary and permanent injunction preventing the City of Columbus from interfering with Columbia's implementation of the meter relocation component of the AMRP.

## THE PARTIES

5. Plaintiff, Columbia Gas of Ohio, Inc., is an Ohio corporation engaged in the business of distributing natural gas to approximately 1.4 million customers in 60 counties throughout Ohio. It is Ohio's largest local gas distribution company. Columbia is a natural gas company as defined by Ohio Rev. Code § 4905.03 (A) (6) and a public utility as defined by Ohio Rev. Code § 4905.02. Columbia is also a pipeline operator as defined in 49 C.F.R. § 192.3, for the purposes of the federal safety standards and requirements regarding the transportation and distribution of natural gas promulgated pursuant to the NGPSA.

6. The City of Columbus is a municipality and political subdivision of the State of Ohio and falls within the definition of "municipality" as defined in the NGPSA, 49 U.S.C. § 60101(a)(15). Boyce Safford III is the Director of the Department of Development for the City of Columbus. The Department of Development is certified by the State of Ohio Board of Building Standards to enforce the Ohio Building Code, the Residential Code of Ohio, and the Ohio Mechanical Code. The City of Columbus adopts and enforces these building code regulations through the Columbus Building Code, Columbus City Code ("C.C."), Titles 41 and 43. The complaint is brought against Defendant Safford in his official capacity for actions he has taken under color of state law to deprive Columbia of rights secured by federal law.

## JURISDICTION AND VENUE

7. The Court has subject-matter jurisdiction over this case, pursuant to 28 U.S.C. § 1331, because Columbia seeks injunctive relief, pursuant to 42 U.S.C. § 1983, to

secure rights guaranteed to it by the United States Constitution. The Court also has subject-matter jurisdiction pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, because of the existence of an actual controversy between the parties as set forth herein, to declare the rights of Columbia.

8. Venue is proper in this district under 28 U.S.C. § 1391(b) and Local Rule 82.1 both because the Defendants conduct their official business in Columbus, Ohio, and because a substantial part of the events giving rise to the claims are occurring in this district.

## BACKGROUND

**Federal Regulation of Pipeline Safety**

9. The Natural Gas Pipeline Safety Act ("NGPSA"), 49 U.S.C. § 60101 *et seq.*, was enacted in 1994 to "provide adequate protection against risks to life and property posed by pipeline transportation and pipeline facilities by improving the regulatory and enforcement authority of the Secretary of Transportation." NGPSA, 49 U.S.C. § 60102(a)(1). The NGPSA is a recodification of two earlier pipeline safety statutes: the Natural Gas Pipeline Safety Act of 1968 and the Hazardous Liquid Pipeline Safety Act of 1979.

10. The NGPSA requires the Secretary of Transportation to prescribe minimum safety standards for pipeline transportation and pipeline facilities which apply to owners and operators of pipeline facilities and may apply to the design, installation, inspection, testing, construction, extension, operation, replacement and maintenance of pipeline facilities. NGPSA, 49 U.S.C. § 60102(a)(2).

4

11. For purposes of the NGPSA, a "pipeline facility" includes intrastate pipeline facilities as well as interstate pipeline facilities. NGPSA, 49 U.S.C. § 60101(a)(9).

12. The safety regulations promulgated by the Secretary of Transportation as required by the NGPSA are contained in 49 C.F.R. Part 192, which is entitled "Transportation of Natural Gas and Other Gas by Pipeline: Minimum Federal Safety Standards." The regulations prescribe safety standards for virtually every pipe, line, facility or apparatus involved in the interstate and intrastate transportation of natural gas, including customer service lines and meters. *See, e.g.,* 49 C.F.R. §§ 192.351 -.383; 192.511.

13. The NGPSA contains an express preemption provision that preempts a State authority, including a municipality, from adopting additional or more stringent safety standards for intrastate natural gas pipeline facilities or intrastate natural gas pipeline transportation unless the State authority has submitted a current certification to the Secretary of Transportation and then only if the standards promulgated by the State authority are compatible with the safety standards promulgated by the Secretary. NGPSA, 49 U.S.C. § 60104(c).

14. The Public Utilities Commission of Ohio ("PUCO") has a current certificate approved by the Secretary of Transportation under 49 U.S.C. § 60105(a). The PUCO has the authority under Ohio law to adopt and enforce natural gas pipeline safety standards and has adopted standards that mirror the federal standards. Ohio Rev. Code § 4905.90 *et seq.*; Ohio Admin. Code § 4901:1-1-16.

15. The City of Columbus does not have a current certificate approved by the Secretary of Transportation that allows it to adopt or enforce safety regulations for intrastate natural gas pipelines or pipeline facilities.

**Columbia's Infrastructure Replacement Program**

16. In 2005, the PUCO opened an investigation into the type of gas risers installed in the state, the conditions of installation and the overall performance of gas risers. The PUCO determined that this investigation was necessary for the protection of public safety. *In the Matter of the Investigation of the Installation, Use, and Performance of Natural Gas Service Risers Throughout the State of Ohio and Related Matters*, Case No. 05-463-GA-COI ("Riser Investigation Case"). In the course of this investigation, the Staff of the PUCO concluded that certain types of field-assembled, "Design A" risers were prone to failure if not assembled and installed properly.

17. A gas riser is the vertical portion of the customer service line that rises out of the ground to connect to the gas meter. A service line is the line that transports the natural gas from a common source of supply to the point of distribution to the customer. A customer service line typically extends from the Company's main up to the outlet of the gas meter or the connection to the customer's piping whichever is downstream.

18. In January 2007, the Chairman of the PUCO issued a letter in the Riser Investigation Case, requesting each of the local gas distribution companies in Ohio to consider the prudence of the then-current regulatory structure which placed responsibility for the service line on the customer, and asked the companies to consider the possibility of taking over the responsibility for the maintenance, repair and

6

replacement of service lines.  At the time Ohio was one of only three states in which the service line is owned by the customer and not the natural gas distribution company.

19.    Columbia responded to the issues raised by the PUCO Staff in the Riser Investigation Case and the Chairman's inquiry by proposing to undertake a major infrastructure replacement program, the IRP, under which it would assume responsibility for the repair and replacement of prone-to-failure natural gas risers and customer service lines associated with such risers and would also assume responsibility for all other hazardous customer service line leaks.  The Commission approved Columbia's proposed IRP by orders dated July 11, 2007 and April 9, 2008 in *In the Matter of the Application of Columbia of Ohio, Inc. for Approval of Tariffs to Recover, Through an Automatic Adjustment Clause, Costs Associated with the Establishment of an Infrastructure Replacement Program and for Approval of Certain Accounting Treatment*, Case No. 07-478-GA-UNC.

20.    As a result of its approval of the proposed IRP, Columbia was permitted to amend its tariff, the "Rules and Regulations Governing the Distribution and Sale of Gas," to reallocate responsibility for the repair and replacement of the customer service line from the customer to Columbia.  Under Columbia's current tariff, approved by the PUCO, the customer's responsibility is limited to the house piping downstream from the outlet side of the meter; Columbia is responsible for the entire service line, including the riser and meter connection.

21.    On March 3, 2008, Columbia filed a rate case application with the PUCO which also sought approval of an alternative rate plan for its gas distribution service.

7

See *In the Matter of the Application of Columbia Gas of Ohio, Inc. for Authority to Amend Filed Tariffs to Increase the Rates and Charges for Gas Distribution Service*, Case No. 08-72-GA-AIR (the "Rate Case").  In the Rate Case, Columbia sought approval to further expand its efforts to improve the safety and reliability of its distribution system beyond the initial IRP by seeking approval of the recovery of the costs associated with its Accelerated Mains Replacement Program ("AMRP"). The AMRP encompasses Columbia's efforts to: 1) systematically replace cast iron, wrought iron, unprotected coated steel and bare steel main pipelines; 2) replace metallic service lines identified during the replacement of the main pipelines; and 3) relocate meters from inside customer premises to outside the premises, where appropriate, as part of the replacement of the service line.

22. The AMRP will produce substantial benefits through the enhancement of pipeline safety and reliability by addressing the replacement of an aging distribution infrastructure.  The AMRP is also intended to foster economic development by re-engineering those affected gas distribution systems to match the current and future needs of the environment and the customers they serve.

23. The PUCO approved the proposed AMRP in its Opinion and Order issued on December 3, 2008 in the Rate Case.  Under the AMRP, Columbia will replace approximately 3,770 miles of bare steel pipe, 280 miles of cast iron pipe and an estimated 350,000 to 360,000 steel service lines (company-owned and customer-owned) over a period of approximately 25 years.  The accelerated replacement of this pipe over a period of 25 years translates into the replacement of 162 miles of pipe per

8

year at an estimated annual cost of $73.6 million. At current replacement rates, absent implementation of the AMRP, it would take 79 years to replace this aging pipe.

24. In order to maximize the benefits and cost-effectiveness of the AMRP, it is important that Columbia follow a systematic approach. Columbia is prioritizing its implementation of the AMRP based on a number of factors, including the size of the customer base in a segment of the service territory, the age of the infrastructure, leak history, and geographic proximity. Concentrating resources in a given priority area allows Columbia to leverage competitive bidding strategies to minimize construction costs and disruption in the community. A systematic prioritized approach also allows for the conversion of larger pipe diameter for low pressure systems to smaller diameter pipe for higher pressure systems which improves reliability and capacity while reducing installation and maintenance costs.

25. Large portions of Columbus are considered to be priority areas for the AMRP because of the size of the customer base, the age of the pipeline facilities, leak history and geographic proximity. AMRP work, including meter relocation, is scheduled to begin immediately in certain areas of Columbus now that the Spring 2009 construction season allows for such projects to be commenced.

26. The meter relocation program is an important component of the AMRP because a key element necessary for successful execution of the AMRP is the assumption that Columbia will be replacing its existing low pressure pipelines with smaller diameter, higher pressure pipelines. This change in pipelines affects how existing inside meters fed from low pressure systems are piped. In particular, the change to higher

9

pressure pipelines requires a regulator to be installed on the meter in order to step-down or decrease the pressure on the outlet side of the meter.  If the meter is not relocated to the outside of the premises as part of this process, it will be necessary to install a separate line to vent the meter to the outside.  The addition of a regulator and outside vent, instead of meter relocation, is a less safe and less practical alternative.

27.  Meter relocation is also important because inside meters create problems for both Columbia and its customers.  Meters are typically read at bi-monthly intervals so that both the company and the customer have an accurate understanding of the customer's usage and liability to the Company.  Columbia must perform at least one actual meter reading on an annual basis, contingent on customers providing Columbia with adequate access to the meters.  The need to gain access to the customer's premises for the purpose of obtaining meter readings inconveniences both the company and the customer and adds to the cost of service.  Relocating meters to outside the customer's premises results in a reduction in meter reading costs, increased meter reading performance, better compliance with PUCO Minimum Gas Service Standards (Chapter 4901:1-13, Ohio Admin. Code), enhanced customer relations, revenue assurances, elimination of meter access issues, and the elimination of consecutive estimated customer bills.

28.  During the course of the Rate case, the PUCO Staff recommended that Columbia provide a cost comparison of the difference between moving meters outside or leaving meters inside in connection with the AMRP. Columbia studied three alternatives:  moving a meter outside, leaving the meter inside with above-ground entry, and leaving the meter inside with below-ground entry.  The respective cost of these

10

three alternatives is $759.59, $839.75, and $812.46, per meter. The cost analysis supported Columbia's determination to relocate meters outside whenever possible.

29. There also are safety benefits associated with the relocation of meters to the outside of the customer's premises where appropriate. Outside meters provide the company with greater accessibility to the meter, which is important in the event of an emergency or event that requires the company to have immediate access to shut off the gas. In addition, when the meter is outside, the risk of a hazardous gas leak is lessened. With an outside meter, any gas leak at the meter connection will dissipate into the air and will not accumulate in the house or business.

30. Columbia's activities in implementing the IRP and AMRP, including work related to the relocation of the customer gas meter, are subject to the gas pipeline safety standards promulgated by the Secretary of Transportation in 49 C.F.R. Part 192, and adopted and enforced by the PUCO, pursuant to Ohio Rev. Code Sections 4905.90 to 4905.96 and Ohio Admin. Code Chapter 4901:1-1-16.

**The City's Determination to Subject Meter Relocation to Local Regulation.**

31. The City of Columbus Department of Development is certified by the State of Ohio Board of Building Standards ("OBBS") to enforce the requirements of the Ohio Building Code, the Residential Code of Ohio and the Ohio Mechanical Code, incorporated by reference in the Ohio Building Code. The City of Columbus has adopted these state building code regulations by incorporating them by reference in the Columbus Building Code, C.C. 4103.03.

32. The Columbus Building Code provides: "No person shall construct, install, or alter any fuel gas piping within the city without first obtaining a gas piping permit from the department [of development] to do such work and paying the fee prescribed therefor in the fee schedule." C.C. 4113.85(A). For purposes of the Columbus Building Code, "fuel gas piping" is defined as "a piping system that connects natural gas, manufactured gas, liquefied petroleum gas, or a mixture of these gases, from a source of supply to a fuel gas-burning appliance(s) and/or a gas outlet(s) for future use." C.C. 4113.85(B). Only an occupying homeowner of a single-family detached residence or a contractor licensed by the department may obtain a gas piping permit. C.C. 4113.85(C). The fee for obtaining a gas piping permit is $150.00 per permit. All work for which a permit is required is also subject to inspection by a city building inspector. C.C. 4115.01.

33. The Columbus Building Code makes a failure to comply with the Code a misdemeanor of the third degree, which is punishable by imprisonment or fines for each violation. C.C. 4111.99. The Code states that strict liability applies to any failure to comply with the Code. C.C. 4111.99.

34. The City of Columbus, through Defendant Safford, has notified Columbia that it has determined that Columbia's relocation of meters from inside the customer's premises to outside the customer's premises constitutes work performed on a "fuel-gas piping system" as that term is defined in C.C. 4113.85, and that no exception applies. The City contends that Columbia may not relocate meters from inside a customer's premises to outside the customer's premises without first acquiring a gas piping permit. The City also contends that any such work must be performed by contractors licensed by the State of Ohio Construction Industry Licensing Board as Specialty Contractors and

12

that an inspection of the work must be performed by the City upon completion of the work.

35. By letter dated February 13, 2009, Defendant Safford notified Columbia that, while the City was willing to consider alternatives to streamline the permitting process to accommodate the expected volume of permitting associated with Columbia's implementation of the AMRP in Columbus, it will not forebear from enforcing its permitting and inspection requirements with respect to the relocation of gas meters by Columbia within the city limits.

36. If Columbia does not acquiesce to the City's position, it must either abandon its meter relocation program within the City of Columbus to its detriment and the detriment of its customers, or risk the imposition of fees for "working without a permit," C.C. 4113.13, the issuance of "stop work order," C.C. 4105.04, or other fines or penalties, C.C. 4111.99.

37. Yet, subjecting Columbia's meter relocation activities to the Columbus Building Code will cause Columbia irreparable injury in that it will increase the cost of its infrastructure repair and replacement programs and delay the implementation of these infrastructure improvements throughout the City of Columbus. It will also cause irreparable injury to Columbia's rights under federal law as well as its relationship with its customers.

38. The gas pipeline safety standards promulgated by the Secretary of Transportation prescribe the standards for testing pipelines and service lines, which mandate the use of pressure testing. Columbia uses pressure testing, as mandated by

13

federal law and the PUCO, to test its work, including work involving meter relocation, upon completion.

39.     The City of Columbus uses a different testing protocol when conducting its inspections of fuel-gas piping systems under the City Building Code.  Instead of using a pressure test similar to that prescribed in the federal standards, the City uses an electronic gas detector, a handheld device that actually tests the air around the piping system, not the system itself.  This form of testing is known to produce results inconsistent with the results achieved by industry-standard, federally-required pressure testing, including false positives.  These inconsistent, inaccurate results occur with an electronic gas detector because the detector will detect and record chemicals, other than gas, such as chemicals that exist in the sprays or sealants used in connection with pipeline maintenance, repair or installation.

40.     Subjecting the meter relocation work performed by Columbia to an added, after-the-fact layer of local, inconsistent testing will result in Columbia having to perform needless additional testing and will cause Columbia's customers needless alarm and concern that the work performed by Columbia was unsafe, even though it complied with all federally- mandated safety standards.

## Claim for Declaratory and Injunctive Relief

## For Violation of 49 U.S.C. § 60104(c) and the Supremacy Clause

41.     The allegations of paragraphs 1 through 40 are re-alleged and incorporated by reference as if fully set forth herein.

42. The "Transportation of Natural Gas and Other Gas by Pipeline: Minimum Federal Safety Standards," promulgated by the Secretary of Transportation in 49 C.F.R. Part 192 create a comprehensive and all-inclusive regulatory framework with respect to the safety of interstate and intrastate pipeline facilities, including service lines and gas meters, which preempts the field with respect to the safety regulation of pipeline facilities, including services lines and gas meters.

43. Congress has affirmatively preempted the authority of State authorities, including municipalities, to regulate the safety of pipeline facilities by the passage of 49 U.S.C. § 60104(c). The City of Columbus may not regulate matters touching upon pipeline safety absent a current certification from the Secretary of Transportation in accordance with 49 U.S.C. § 60105(a).

44. As a result of the Supremacy Clause of the United States Constitution, U.S. Const. Art. 6, § 2, the NGPSA, particularly Sections 60104(c) and 60105(a) of the Act, and the Minimum Federal Safety Standards promulgated in 49 C.F.R. Part 192 take precedence over State and local laws touching upon the safety of natural gas pipelines, including service lines and gas meters.

45. The Columbus Building Code, codified in Columbus City Code, Titles 41 and 43, and the Ohio Building Code, the Residential Code of Ohio and the Ohio Mechanical Code, incorporated into the Columbus Building Code by reference, are safety regulations.

46. The City of Columbus does not have a current certificate from the Secretary of Transportation that would allow it to regulate the safety of intrastate pipeline facilities.

47. The City of Columbus building code regulations are preempted by the NGPSA and the Minimum Safety Standards promulgated in 49 C.F.R. Part 192 insofar as they seek to regulate the work performed on natural gas pipeline facilities, including service line maintenance, repair or relocation and gas meter relocation, by Columbia.

48. Any action by the City of Columbus to enforce its building code regulations on work performed on natural gas pipeline facilities, including service line repair or relocation and gas meter relocation, by Columbia violates the NGPSA and the Supremacy Clause of the United States Constitution.

49. The City of Columbus' enforcement of its building code regulations with respect to Columbia's AMRP, including the meter relocation component of AMRP, will cause Columbia irreparable injury for which Columbia has no adequate remedy at all.

WHEREFORE, Columbia demands judgment against the City of Columbus and Defendant Safford in his official capacity and asks for the following relief.

1) a declaration that Defendants violate the Natural Gas Pipeline Safety Act, 42 U.C.S. § 60101, *et seq.*, the rules promulgated in 49 C.F.R. Part 192, and the Supremacy Clause of the United States Constitution, U.S. Const. Art. 6, § 2, by seeking to require Columbia to obtain a permit from the City of Columbus and to subject its

work under the Accelerated Mains Replacement Program, including meter relocation, to inspection in accordance with the City of Columbus Building Code;

2) a preliminary and permanent injunction prohibiting Defendants from enforcing the Columbus Building Code, or any other local safety regulation, with respect to Columbia's activities to maintain, repair or replace intrastate pipeline facilities, including the relocation of gas meters; and

3) a declaration that Defendants, by seeking to wrongfully enforce local building code regulations in an area preempted by federal law, are depriving Columbia of rights secured by federal law in violation of 42 U.S.C. § 1983 and an award of attorney fees in accordance with 42 U.S.C. § 1988.

Respectfully submitted,

<u>s/ Kathleen M. Trafford by Bryan R. Faller</u>
Kathleen M. Trafford (0021753), Trial Attorney
Daniel R. Conway (0023058)
Bryan R. Faller (0072474)
PORTER WRIGHT MORRIS & ARTHUR LLP
41 South High Street
Columbus, Ohio 43215
Telephone:  614.227.2000
Facsimile:  614.227.2100
E-mail: ktrafford@porterwright.com
           dconway@porterwright.com
           bfaller@porterwright.com

*Attorneys for Plaintiff*
*Columbia Gas of Ohio, Inc.*

COLUMBUS/1484245 v.02

17