UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**Columbia Gas of Ohio, Inc.,**

    **Plaintiff,**

**-v-**                                                  **Case No. 2:09-cv-299**
                                                     **Judge Michael H. Watson**

**City of Columbus, et al.,**

    **Defendants.**

## OPINION AND ORDER

Plaintiff Columbia Gas of Ohio, Inc. ("Columbia") asserts claims under the Natural Gas Pipeline Safety Act ("NGPSA"), 49 U.S.C. § 60101 *et seq.*, and the Supremacy Clause of the United States Constitution, U.S. Const. Art. 6 § 2, arguing that federal law preempts defendants' Building Code with respect to Columbia's gas meter relocation activities. This matter is before the court upon the parties' cross-motions for summary judgment. (Docs. 13 and 14). For the reasons that follow the Court grants Columbia's summary judgment motion and denies defendants' summary judgment motion.

### I. Facts

The Court derives the following facts from the parties' joint stipulation of facts. (Doc. 6).

Columbia is an Ohio corporation engaged in the business of distributing natural gas throughout Ohio. As a pipeline owner and operator, as defined in 49 C.F.R. §

192.3, Columbia is subject to the federal safety standards regarding natural gas transportation and distribution under the NGPSA.

Defendant City of Columbus is a municipality and political subdivision of the State of Ohio and a "municipality" as defined in the NGPSA, 49 U.S.C. § 60101(a)(15); defendant Boyce Safford III is the Director of Development for the City of Columbus (collectively, "City").

The instant lawsuit concerns Columbia's relocation of gas meters from the inside of its customers' premises to the outside of the premises. The parties dispute whether such activities are subject to certain provisions of the Columbus Building Code or whether federal law preempts those provisions.

The key segments of the natural gas local distribution system are: (1) the distribution line that serves as the common source of supply for more than one service line or customer, commonly called the "main"; (2) service lines that transport the natural gas from a main to the point of distribution to the customer, typically the outlet side of the meter; (3) the vertical gas riser that rises out of the ground to connect to the gas meter; and (4) the gas meter, which measures the transfer of gas from an operator to a consumer. The piping downstream of the outlet side of the gas meter is known as the house piping or premises piping. This piping allows gas to be transported downstream from the meter through the customer's premises to fuel the customer's equipment and appliances.

The Secretary of Transportation, under 49 U.S.C. § 60105(a), has authorized the Public Utilities Commission of Ohio ("PUCO") to enforce federal pipeline safety standards in Ohio with respect to gas distribution companies, including Columbia.

Under Columbia's current tariff, approved by the PUCO, Columbia is responsible for the main, the service line, including the riser, and the meter connection, and the customer is responsible for the house piping downstream from the outlet side of the meter.

The PUCO has approved Columbia's Accelerated Mains Replacement Program ("AMRP"). The AMRP began in Columbus in 2008 and the current phase is continuing throughout the fall of 2009. The program is projected to take approximately 25 years. The AMRP includes the following changes to the gas distribution system: (1) replacement of cast iron, wrought iron, unprotected coated steel, and bare steel main pipelines; (2) replacement of metallic service lines in conjunction with the replacement of the main pipelines; and (3) relocation of meters from inside the customer premises to outside the premises, where appropriate, as part of the replacement of the service line.

Relocating a gas meter to outside the customer's premises requires the following steps: the gas is shut off; the old meter is removed; a new meter is connected to the service line outside the customer's premises; the exterior building wall is drilled to allow a fuel pipe to be extended from the now outside meter to inside the customer's premises; a new fuel pipe is installed to reconnect the newly installed outside meter to the existing house piping; the entire system, including the house piping and connection to all gas appliances, is tested for leaks; and gas service is restored.

The fuel pipe installed to connect the new meter's outlet to the house piping is typically two to four feet in length, but may be up to forty feet in length. After the meter relocation process is complete, the fuel pipe, which is downstream from the meter outlet, becomes part of the house piping, and, thus, the customer's responsibility.

The Columbus Building Code provides: "No person shall construct, install, or alter any fuel gas piping within the city without first obtaining a gas piping permit from the department [of development] . . ." COLUMBUS, OHIO, CITY CODE § 4113.85(A) (1959). Such work must also be performed by contractors licensed by the State of Ohio Construction Industry Licensing Board as Specialty Contractors, and is subject to inspection by a city building inspector upon completion. COLUMBUS, OHIO, CITY CODE § 4114.107, 4115.01 (1959). The fee for obtaining a gas piping permit is $150.00 per permit.

The inspection standard for the gas distribution industry is to have a quality assurance program for work performed by gas company employees or contractors performing covered tasks on behalf of the company. Independent third-party inspections of work performed by company employees or contractors is not an industry standard. The inspection performed by Columbia involves a pressure test of the piping itself. The inspection that the City would require uses an electronic gas detector and follow up bubble test. Under this test, the air around the piping is tested and may produce a false positive as a result of other chemicals in the air.

The City argues that Columbia's meter relocation program is subject to the Columbus Building Code because the reconnection of the new meter to the existing house piping and the lengthening of house piping involves fuel-gas piping on the outlet side of the gas meter. On February 13, 2009, Defendant Safford notified Columbia by letter that the City plans to enforce its permitting, licensing, and inspection requirements with respect to Columbia's meter relocation program within the City of Columbus. The

parties were unable to agree regarding enforcement of the City's requirements, and Columbia filed the instant suit.

## II. Summary Judgment

The standard governing summary judgment is set forth in Federal Rule of Civil Procedure 56(c), which provides:

> The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c).

The Court may grant summary judgment if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). *See also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986); *Petty v. Metropolitan Government of Nashville-Davidson County*, 538 F.3d 431, 438–39 (6th Cir. 2008).

When reviewing a summary judgment motion, the Court must draw all reasonable inferences in favor of the nonmoving party, who must set forth specific facts showing that there is a genuine issue of material fact for trial, and the Court must refrain from making credibility determinations or weighing the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000); *Henderson v. Walled Lake Consol. Sch.*, 469 F.3d. 479, 487 (6th Cir. 2006). The Court disregards all evidence favorable to the moving party that the jury would not be not required to believe. *Reeves*, 530 U.S. at 150–51. Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 511 (6th Cir. 2009).

Thus, the central issue is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234–35 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251–52).

### III. Discussion

The sole issue in this case is whether the Natural Gas Pipeline Safety Act (NGPSA), 49 U.S.C. § 60101 *et seq.*, and the Supremacy Clause of the United States Constitution, U.S. Const. Art. 6 § 2, preempt the application of the Columbus Building Code, and specifically the permitting, licensing, and inspection regulations contained in Columbus City Code §§ 4113.85(A), 4114.107, and 4115.01, to work performed by Columbia, through employees or independent contractors, to relocate gas meters from inside to outside the customer's premises. Columbia asserts that the NGPSA expressly preempts application of the City's Building Code to the meter relocation process. The City contends that the NGPSA and federal preemption apply only to that portion of the pipeline which Columbia owns or controls.

Federal preemption derives from the Supremacy Clause of the United States Constitution, which provides that validly enacted federal laws preempt state laws on the same subject:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S. Const. Art. 6 § 2. Preemption is a question of congressional intent and can take one of three forms. *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 299–300 (1988). First, express preemption occurs when Congress explicitly states the extent to which a federal law preempts state and local laws. *Id.* at 299. Second, field preemption exists when Congress implicitly indicates an intent to occupy a given field to the exclusion of state law; that is, when there is no room left for state regulation. *Id.* at 299–300. Finally, conflict preemption may exist where it is impossible to comply with both federal and state law or where the state law is an obstacle to accomplishing Congress's full purposes. *Id.* at 300. The instant case concerns the express preemption provision of the NGPSA.

The federal government has had a long-standing regulatory presence in the area of natural gas and pipeline safety. The Natural Gas Act ("NGA") of 1938 regulates wholesale transactions of natural gas in interstate commerce, and was intended to achieve uniformity of regulation regarding the transportation and sale of natural gas. *See Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 310 (1988). The Natural Gas Pipeline Safety Act ("NGPSA") of 1968 expanded federal jurisdiction over natural gas transportation and distribution by giving the Secretary of Transportation authority to establish minimum safety standards for both interstate and intrastate pipeline transportation and facilities. 49 U.S.C. § 60102(a)(2) (2006).

The stated purpose of the NGPSA is "to provide adequate protection against risks to life and property posed by pipeline transportation and pipeline facilities by improving the regulatory and enforcement authority of the Secretary of Transportation." 49 U.S.C. § 60102(a)(1) (2006). The standards promulgated by the Secretary "apply to

owners and operators of pipeline facilities," such as Columbia, and "may apply to the design, installation, inspection, emergency plans and procedures, testing, construction, extension, operation, replacement, and maintenance of pipeline facilities."  49 U.S.C. § 60102(a)(2)(A)–(B) (2006).

Columbia relies upon 49 U.S.C. § 60104(c) in contending that the NGPSA expressly preempts the application of the City's Building Code to the meter relocation process.  In the NGPSA, Congress explicitly stated that state laws establishing pipeline safety standards are preempted unless they comply with specific requirements:

> Preemption.—A State authority that has submitted a current certification under section 60105(a) of this title may adopt additional or more stringent safety standards for intrastate pipeline facilities and intrastate pipeline transportation only if those standards are compatible with the minimum standards prescribed under this chapter.  A State authority may not adopt or continue in force safety standards for interstate pipeline facilities or interstate pipeline transportation.

49 U.S.C. § 60104(c) (2006).[1]  Thus, a state authority may impose safety standards for intrastate pipelines in addition to the federal standards only if the state authority applies and is approved by the Secretary of Transportation through an annual certification process pursuant to 49 U.S.C. § 60105 and the standards imposed are compatible with the federal standards.  49 U.S.C. § 60104(c) (2006).

The City concedes that its regulations impose "safety standards" and that it has not submitted a current certification to the Department of Transportation ("DOT").  However, the City argues that the NGPSA preemption provision is inapplicable to those portions of the gas distribution system for which the customer is responsible—the house

---

[1] While the instant case concerns the express preemption provision of the NGPSA, it is worth noting that another Court in this District has found that the NGPSA "completely preempts the field of pipeline safety." *Swango Homes, Inc. v. Columbia Gas Transmission Corp.*, 806 F. Supp. 180, 185 (S.D. Ohio 1992).

piping downstream from the meter. Because the meter relocation process requires Columbia to detach the existing meter from and connect the new meter to the customer's house piping, which may need to be lengthened to reach the new meter, the City argues that the NGPSA does not apply and, therefore, does not preempt the City's regulation of that part of the meter relocation process involving the customer's house piping.

Thus, the dispute in this case turns on what Congress intended to be included in the preemption provision's terms "intrastate pipeline facilities" and "intrastate pipeline transportation." The following definitions from the NGPSA and regulations promulgated by the Secretary shed light on the meaning of the provision and the intended reach of preemption in the area of pipeline safety:

> "[G]as pipeline facility" includes a pipeline, a right of way, a facility, a building, or equipment used in transporting gas or treating gas during its transportation.

49 U.S.C. 60101 § (a)(3) (2006).

> "[I]ntrastate gas pipeline facility" means a gas pipeline facility and transportation of gas within a State not subject to the jurisdiction of the Commission under the Natural Gas Act (15 U.S.C. 717 et seq.).

49 U.S.C. 60101 § (a)(9) (2006).

> "[P]ipeline transportation" means transporting gas and transporting hazardous liquid.

49 U.S.C. 60101 § (a)(19) (2006).

> Pipeline means all parts of those physical facilities through which gas moves in transportation, including pipe, valves, and other appurtenance attached to pipe, compressor units, metering stations, regulator stations, delivery stations, holders, and fabricated assemblies.

49 C.F.R. § 192.3 (2008).

> Pipe means any pipe or tubing used in the transportation of gas, including pipe-type holders.

*Id.*

As Columbia points out, the preemption provision and the definitions of its relevant terms do not state a limitation of the federal law to only operator-owned "pipeline facilities," "pipelines," or "pipes." The definitions all focus more broadly on those facilities, pipelines, and pipes involved in the transportation of gas.

In arguing that the preemption provision applies only to that portion of the gas distribution system owned or controlled by Columbia, the City relies primarily upon the definition of "service line" in 49 C.F.R. § 192.3:

> Service line means a distribution line that transports gas from a common source of supply to an individual customer, to two adjacent or adjoining residential or small commercial customers, or to multiple residential or small commercial customers served through a meter header or manifold. *A service line ends at the outlet of the customer meter or at the connection to a customer's piping, whichever is further downstream, or at the connection to customer piping if there is no meter.*

49 C.F.R. § 192.3 (2008) (emphasis added). The City infers from this definition an intention to end the application of the NGPSA at the point of connection to the customer's piping. However, the NGPSA preemption provision does not state that preemption extends only to the service line; indeed, the preemption provision does not even use the term "service line" at all. Preemption is applicable to safety regulations of "intrastate pipeline transportation" and "intrastate pipeline facilities," of which the service line is but one part.

In response to the City's service line argument, Columbia relies upon *Southern Union Co. dba New England Gas v. Lynch*, which the Court finds persuasive. In *Lynch*, the District of Rhode Island held that the NGPSA preempted a state statute requiring

persons working on natural gas connections to end-users and non-appliance equipment to have state licenses. *Southern Union Co. dba New England Gas v. Lynch*, 321 F. Supp. 2d 328, 341 (D. R.I. 2004). The state required any worker performing pipefitting work within a residence to obtain a license from the state. *Id.* at 330. The New England Gas Company ("NEG") performed work on gas lines located both inside and outside customers' homes. *Id.* NEG filed suit arguing that the state's licensing requirement was expressly preempted by the NGPSA. *Id.* at 339. The state responded, as the City does in the instant case, that the NGPSA does not apply to activities beyond the service line, and, therefore, does not preempt the state's regulations as applied to work performed on the outlet side of the meter. *Id.*

Examining the relevant provisions of the NGPSA and CFR, the court concluded that "the NGPSA contemplates the control over and regulation of a massive expanse of natural gas-related activities, including those that occur on or inside a customer's premises." *Id.* at 340. The court then specifically rejected the state's reliance upon the definition of "service line," noting that the preemption provision makes no mention of the "service line." *Id.* Rather, the NGPSA discusses preemption as applying to the more comprehensive "intrastate pipeline facility" and "intrastate pipeline transportation." *Id.* The court further pointed out that not finding the meter terminus as the line of demarcation between federal and state authority, made sense from a practical standpoint:

> It . . . would be illogical to conclude that Congress intended the reach of the NGPSA's safety requirements to terminate at the meter, just short of where they may matter most-the customer's home. NEG's workers have job responsibilities that routinely require them to handle instruments that, though "downstream" from the meter, are unquestionably part of an

> 'intrastate pipeline facility' or of a system of 'intrastate pipeline transportation.'

*Id.* at 341. Thus, the court determined that, because the state had not obtained the appropriate certification from the Secretary of Transportation pursuant to 49 U.S.C. § 60105(a), the NGPSA preempted the state's safety regulations. *Id.* at 342. This Court agrees with the Rhode Island District Court's conclusion that the application of the NGPSA does not necessarily end at the outlet side of the meter.

Additionally, the City's reliance upon *Brady v. Consolidated Edison Co. of New York* is misplaced. In *Brady*, an explosion resulted from the installation of a water tank near a gas line. *Brady v. Consol. Edison Co. of New York*, 103 Misc. 2d 124, 125 (N.Y. Sup. Ct. 1979). The court determined that a gas operator has a duty to maintain the service line, which extends to the connection to a customer's piping, regardless of whether the service line is owned by the gas company or the customer. *Id.* at 127. In its analysis, the court noted that the definition of service line was broadened to ensure that the DOT had jurisdiction "to regulate the transportation of gas to the point where it is used by the consumer." *Id.* at 126. However, this case does not support the City's conclusion that the NGPSA never applies at the point that ownership of the gas moves from the gas company to the customer. *Brady* merely establishes that the service line is within the DOT's jurisdiction—not that jurisdiction never extends beyond the service line.

Moreover, any conclusion that federal jurisdiction over gas pipelines never extends beyond the service line is plainly in conflict with DOT regulations. Regulation of the gas distribution system has included the piping downstream of the meter. *See, e.g.*, 49 C.F.R. § 192.379(c) (2008) (For "[e]ach service line that is not placed in service upon completion of installation . . . [t]he *customer's piping* must be *physically disconnected*

from the gas supply and the open *pipe ends sealed*") (emphasis added); 49 C.F.R. § 192.727(d)(3) (2008) ("Whenever service to a customer is discontinued . . . [t]he *customer's piping* must be *physically disconnected* from the gas supply and the open *pipe ends sealed*.") (emphasis added). These regulations cover portions of the piping downstream of the meter. In doing so the regulations demonstrate that, with respect to some covered activities, contact with the piping downstream of the meter may be necessary and, therefore, subject to the NGPSA.

Subpart H of 49 C.F.R. § 192 regulates the location, installation, and testing of customer gas meters, which necessarily requires contact with the piping downstream of the meter. *See* 49 C.F.R. § 192.351–192.359. 49 C.F.R. § 192.357(a) specifically provides that "[e]ach meter and each regulator must be installed so as to minimize anticipated stresses upon the *connecting piping* and the meter." 49 C.F.R. § 192.357(a) (emphasis added). In promulgating the regulations of meters, the DOT clearly understood that such work would necessarily involve contact with the customer's piping. Thus, these regulations suggest an intent that at least when the customer piping is involved in a gas company's activities on the meter, it is subject to the NGPSA and preemption applies.

In the instant case, the contact with the customer's piping is incidental to Columbia's primary activity: relocation of the customer's meter. As part of Columbia's meter relocation program, some steps in the complex multi-step process necessarily involve contact with the customer's piping. Nonetheless, such contact is contemplated by the regulations and does not exempt the work from the application of the NGPSA or the federal preemption provision. That meter relocation may require extension of the

house piping for some customers does not change the application of the NGPSA and DOT regulations to this process.

Finally, the City contends that it has an interest in protecting the safety of its citizens and that its regulations are necessary to assure the customer that the work has been properly done. The federal law is aimed at the same interests: to "protect[] against risks to life and property." 49 U.S.C. § 60102(a)(1) (2006). Wherever the City's Building Code does not control Columbia's activities, federal regulations do control, assuring the customer that the work has been properly done. The NGPSA prescribes an operator qualification system pursuant to 49 U.S.C. § 60102(a)(2)(C) and 49 C.F.R. § 192, Subpart N to ensure that pipeline operators and personnel are qualified in accordance with federal standards. The PUCO requires testing of the downstream piping any time gas service is initiated or reestablished. Ohio Admin. Code § 4901:1-13-05(A)(3). Columbia also treats meter installation and replacement, including reconnection and testing of piping downstream of the meter, as covered by the federal safety standards in its operator qualification program. As long as Columbia's meter relocation activities comply with federal safety standards, as enforced by the PUCO, the safety mandates of Congress and the DOT protect the customer.

The federal law concerns the safety of the gas distribution system, whether certain parts of that system are owned by the gas company or the customer. Meter installation and location, which includes relocation, is regulated by the DOT under the NGPSA. While Columbia's meter relocation process requires contact with and extension of the customer's house piping, the regulations contemplate such incidental contact. Accordingly, the NGPSA applies to Columbia's meter relocation activities.

Because the City is not certified by the DOT, as required by the NGPSA preemption provision, the City may not enforce safety standards upon Columbia's meter relocation work. The PUCO, which is certified by the DOT and therefore authorized to enforce federal pipeline safety standards, has approved Columbia's meter relocation program. The Court finds that the NGPSA preempts the City's Building Code as applied to Columbia's meter relocation activities. Therefore, Columbia is entitled to summary judgment as a matter of law.

## IV. Disposition

Based on the foregoing, the Court **GRANTS** plaintiff's motion for summary judgment (Doc. 13) and **DENIES** defendants' motion for summary judgment (Doc. 14). The Clerk shall remove Docs. 13 and 14 from the Court's pending motions list.

Accordingly, the Court orders, adjudges, and decrees the following:

1. The NGPSA preempts the City's Building Code as applied to Columbia's meter relocation activities.

2. Defendants and their agents are permanently enjoined from enforcing the subject provisions of the City Code against Columbia in connection with Columbia's meter relocation activities.

The Clerk shall enter final judgment in favor of Columbia, and against defendants.

IT IS SO ORDERED.

*/s/ Michael H. Watson*
**MICHAEL H. WATSON, JUDGE**
**UNITED STATES DISTRICT COURT**